Thank you so much. Oh, wait here. You're responding. Yes. Excuse me. All right. So, you're Mr. Okay. I can hear you great. Can you hear me your honor. Yes, you're fine. Okay. Okay. All right. Well, we'll go ahead and whenever you're ready to get started and we've got a couple of three minutes I guess for whenever you're ready. Thank you, Your Honor. Good morning, please the court. My name is Pietro Lynn and I represent the appellate in this case Joseph Carl. Officer Carl is a police officer in the Burlington Police Department and the issues that bring them here today are twofold. One is a denial of summary judgment on the basis that there was or there are facts that could support an excessive force claim. And the second that he was not entitled to qualified immunity. And of course, the appeal in this case is brought pursuant to the denial of the qualified immunity claim. So, Your Honor, let me begin first with framing the questions that this court needs to answer in order to properly decide the appeal. The first is whether there was actually a violation of the Fourth Amendment right by virtue of the use of excessive force. The second is whether even if there was excessive force there, the officer is entitled to qualified immunity. We believe the answer is that there was no violation of constitutional rights by virtue of the use of excessive force. And even if there was, there ought to be qualified immunity. So let's talk a little bit about the facts of this case and then apply the law that would govern those two issues. The facts of the case is that on September 8th of 2018, Joseph Carl was on patrol for the Burlington Police Department in the early morning hours. And for those of you who have not been to Burlington at 1 a.m. as the bar is let out, there can be oftentimes alcohol fuel disturbances. And in fact, that is what happened on the night of this incident. We've submitted to the court body cam footage, which shows what Officer Kuro saw as he approached the scene. Mr. Lynn, let me just jump in. I mean, I think one of the things with your position I'm struggling with is it appears to me that there are disputes in terms of what actually occurred in the briefing. It very much kind of takes the position of your client. But here, if there are, in fact, factual disputes, then there isn't an isn't an entitlement to summary judgment on this. And then you bring up the video camera as well, which I've looked at excerpts of that. And it appears to me that the conduct, what actually happened when your client approached the scene, that there are factual disputes in that. And I understand that you have a certain position about what occurred. But the witness testimony varies in terms of whether or not Mr. Joke hit someone or not. I mean, there's conflict on that point. There's conflict on what happened when your client approached the scene. I don't I don't. To me, there are factual disputes. And as to the critical issue of what happened, what was the conduct? And so I guess I'd like you to address that. Yes. So, Judge, there may be some factual disputes. But remember, the question for the court to decide is whether, from the perspective of a reasonable officer, Officer Kuro acted appropriately. And I remind the court both in the great decision and in a decision decided by this court, Stevenson versus Doe. What this court cautioned is that it's acceptable for officers to make a reasonable mistake of fact that justifies the use of force. But can I ask the way I see it? There are at least four big. Disputed facts. And if you would respond to see if you think any of them can be dispensed with or if you think any of them are dispositive. One was whether or not Mr. Jock definitely punched somebody. The second was whether your client gave a command before taking Jock down. The third was whether or not Jock tried to resist arrest. And the fourth was whether or not Mr. Jock tried to attack Officer Cara. Do all four of them equally matter? Do you think any of them are not disputed? Can you respond to those, please? Yeah. So let me answer the question this way. What we know is this. So first of all, there's body cam footage that shows Mr. Jock lunging forward toward another man. My client either accurately or mistakenly thought that he struck that other man. There were other witnesses who reached the same conclusion, which we would submit suggests that it was reasonable for him mistakenly or accurately to conclude that the other person was struck by Mr. Jock. We see Mr. Jock come back and continue to engage in very vigorous verbal interchanges and being held back by another person. So that is on the video, and it would be exactly what my client saw as the approach. So then, Your Honor, let me address the next question, which is what was their warning? The warning was this, and we see this also on the video, that my client turned Mr. Jock as he placed his hands on him. Mr. Jock, who knew my client, saw that he saw Mr. Jock. Well, that's disputed too, right? I mean, the – that's not? No. No, Your Honor. Mr. Jock – and this is in the material – Mr. Jock acknowledged that he knew my client from earlier interactions. He said he didn't know his name, but he knew him by his presence, right? He recognized him from earlier interactions and had never had any unpleasant or unprofessional interactions with Joe Curro before this night. Okay. Well, then – but that – how does that help you then? If, like, your – if the client – if your client and Mr. Jock had no negative interaction before, then why was it reasonable for your client to pursue that there would be a problem in this incident? Well, so let me answer the question this way, Your Honor. What my client knew going into this – and this is also undisputed and in the record – was that Mr. Jock had a history of violence. This was somebody who engaged in violence and sometimes aggression towards police officers. It was something that was raised in roll call at the Burlington Police Department about Mr. Jock. So what my client knew going into this interaction was that Mr. Jock was somebody who was potentially dangerous. Well, except – And there's a greater conflict. I mean, the district court finds, I think, that that – again, that is in dispute. And I think you keep turning us towards your version, but the question isn't whether your version could prevail. The question, both for the determination of whether we even have appellate jurisdiction, because this is a qualified immunity issue, and whether your client is entitled to qualified immunity, turns out whether there are genuine disputes of material facts. So I think there's evidence in the record that says Jock testified or joked – I'm sorry, that Acoro testified that he couldn't recall who told him this person was dangerous. He wasn't aware he had any history of resisting arrest prior to the incident. There's a difference between a person being generally known to a police department and a specific officer having specific knowledge of a person's history. So, again, as my colleagues have asked, isn't this all in dispute? And so, look, what I would submit to Your Honor is that the operative facts that are important on this issue of qualified immunity are not in dispute. And I would put the – have the court look at the – closely at the Brayshaw decision, both for the purposes of determining whether there was a violation of constitutional rights, but equally importantly on the issue of qualified immunity. Even if we believe the allegations, let's assume for a moment that Officer Kerber saw Mr. Jock lunge forward having a loud and vigorous conversation at 1 in the morning outside of a bar. And he approached – he put his hands on Mr. Jock, and Mr. Jock then turned, and this is undisputed because it is in the video, right? And that I would suggest to the court at a minimum under Brayshaw is in that hazy area between acceptable and excessive force. At worst, there are no cases that were cited by the district court that in any way resemble this case. All of those cases cited both by my adversary and the district court had to do with compliant suspects, not suspects like Mr. Jock. Ms. Doolin, can I just ask you, when you're referring to video, there was a fair amount of video, and I looked at – I don't know if you're referring specifically to the body cam video as reporting to show the strike and the resistance. What video are you saying shows this? Yeah, so, Your Honor, twofold. One is that we have the body cam video. And then also as part of the statement of undisputed material facts at the district court level, there are three allegations which contain photographs, video images that are still shots that show Mr. Jock's positioning during the course of this interaction with Officer Kerber. And this issue of the bladed stance, which is an aggressive position, the question of raising his hand, those are all things that are captured images that support the allegations here. To say that something is not true when it is captured as an image, it does not – it's a tested issue of fact. Right, but just to be clear, and I can go back and look, but these images that you're referring to, are these images taken from Quarro's body cam or are these different images? Because I've looked at the body cam video, and so to me it is not nearly as clear in depicting some of these things you're describing. Yeah, so I would refer the court to the record, and in our statement of undisputed material facts that we submitted to the court below, if the court looks at allegation or statement of material fact, undisputed material fact, paragraph 43, 44, and 47, those are all areas where there are captured images from other video sources. And those are equally elucidating on the question of whether Mr. Jock was compliant or something else. Okay, so that's just – so just to be clear then, so these images you're referring to are not from his body camera? They're from other individuals? That is correct. Okay. All right. All right, I think we have your position. We have some rebuttal time coming up. We will hear from your adversary. Thank you. Thank you, Your Honor. Good morning. May it please the court, I'm Rob Spenceley. I represent Mahbir Jock. Your Honors, just to begin by addressing some of what we just heard, I wanted to reemphasize the importance of really the defendant is again doubling down on their version of the facts. We hear them talking about a history of violence known to the department, but it is pointed out by Judge Sessions and argued heavily by myself in the briefings that this particular officer did not have any such knowledge about Mr. Jock, despite dealing with him a bunch of times. He did not have that as an impression. And also to hear the defense say that the video shows the raising of the hands, a clenched fist, a bladed position, I believe that this defendant wishes that it was just still shots and not a video because I believe that any still shot is taken from the body cam video. So if there's other still shots under discussion here, I would ask for the defendant to disclose those to me. I'm pretty sure they're all from that same video that you watched, Your Honor. In the video, it does not confirm any of those statements and Judge Sessions didn't think so either. To me, this is a case that is being argued by the defendant in a way that was similar to Cohen v. Breen, which was a case where the Second Circuit made a point to say that the defendant's brief on appeal is replete with his own version of events. To the extent Breen's version of the events is disputed by Cohen, Breen's version forms no proper basis for this appeal. And you hear the defendant is making legal arguments as well, but those are based, how could they not be, on their own version of the facts. So they're saying their version of the facts again, and then they're saying, oh, there is no Second Circuit law that squarely addresses this. There's no law that we should follow from the Second Circuit. But they're talking about their version of the facts when they say that. So can I ask, I mean, so I understand your position on both the excessive force and the violation of the Fourth Amendment and the qualified immunity. Can you elaborate more on your stripping or your argument that we don't have jurisdiction? Your Honor, I think you do have jurisdiction to talk about that. You do have jurisdiction to talk about the materiality of facts, and you have jurisdiction, of course, to analyze the legal arguments made by opposing counsel. So I certainly didn't mean to imply that you had no jurisdiction here. I meant to mainly imply. You can suggest that. If we don't, we don't. That's an argument to be made or not. This is a question on qualified immunity. An interlocutory appeal is on qualified immunity. Yes. We have jurisdiction if the undisputed facts allow us to evaluate that question as a matter of law. Isn't that? So are you saying that we're only dealing here with undisputed facts? You want us to only do that? Because my concern is that we lack appellate jurisdiction at this interlocutory appeal if the basis for the trial court's denial of qualified immunity is a factual dispute. That's my read of our law on that. I'll revise my answer, Your Honor. I do mean to show this court the utmost respect. And reading the case law, I know that you're allowed to look at the materiality, not the genuineness of the fact. You're also allowed to review legal arguments. I wrote that there was no jurisdiction because I did believe that. I believed that the defendant was making argument based only on their version of the facts. I thought in their reply brief they might see that their approach had perhaps been a wrong approach and change what they were saying. And instead what they did is double down and hung their hat on the one fact about the investigation, which I didn't feel was a very material fact to emphasize. But was a fact that Judge Sessions specifically singled out in saying some dispute also exists as to what the Burlington Police Department's internal investigation revealed. And he even went into detail talking about how some of the information for that internal investigation was provided by Officer Belavance, who had the wrong impression of the person who was hit. He was believing that this other witness who's a witness for us, AJ, was the one who was hit, the guy in the blue checkered shirt. But that was the guy who was standing between my client and the person he was arguing with. So that's the type of information that was being supplied to this internal investigation. And so when the defendant says that, where do I get off disputing that? That the Burlington Police came to this, Burlington Police Department came to this conclusion in their internal investigation. How could I say they didn't? It's because I believe that it's a misleading statement. And that the people who made those decisions were confused, frankly. They were. Chief Del Pozo believed that Officer Coro meant to take Mabier Jacques to the ground and arrest him from the ground. And admitted that in his deposition. Officer Coro instead testified that he tried to turn Mabier around after silently approaching and giving no verbal commands whatsoever. That he tried to turn him around and that Mabier then resisted, which is not reflected by the video and is not echoed by eyewitnesses on the scene. So I went off on a tangent there, Your Honor. I don't believe that this court has jurisdiction because I believe that this defendant still today continues to argue their version of the facts. And in Breen, I think that the Second Circuit made it clear that as far as that is concerned, it does take away the court's jurisdiction. We're not offended when 1291 or 1292 limit our jurisdiction. You don't have to worry about that. Okay. All right. So when the defendant is making arguments, they are making arguments from their story. Their story is that a riot was about to touch off on the street. You know that if Coro hadn't taken Mabier down and thrown him face down, holding his arm into the pavement so his head hit the pavement, knocking him unconscious. That if he hadn't done that, this whole street would have erupted in some kind of a riot. That is what they're continuing to argue today. They're continuing to argue that when my client saw Officer Coro for the second or second and a half before he was taken to the ground, that he resisted. And that is disputed. But that's part of their facts for today. Their facts for today are that my client was actually punching somebody. I hear actually the defendant possibly walking back from that for the first time today, just a moment ago. Lunging. Usually they're very clear on the sound of a punch. Officer Coro said he heard the sound of a punch. And I have witnesses that dispute that. And then in terms of the law, I believe that there is adequate law in the Second Circuit to very squarely address this situation. The defendant in their brief tries to minimize really our event where a person was knocked unconscious. The defendant concedes when their head hit the pavement and their face was lacerated. That's what they do concede, by the way. But then try to make it seem de minimis compared to a case like Robeson, where the plaintiff was yanked out of a car, pushed into an open car door. Imagine the inside of the door. And then had the arm twisted behind their back. The injuries sustained from Robeson were bruises lasting for a matter of weeks. We're talking here about somebody who was knocked unconscious and lay unconscious for about a minute. The Maxwell case is good precedent, too, that can be applied here. Which I think is also less dire circumstances than what we're dealing with in Jock. And in that case, the plaintiff was forcefully thrust into a police cruiser so that apparently their face ran into the metal partition that separates the front seats from the back seats. Nothing about anybody unconscious there. The Rogoz, I don't know if I'm pronouncing that correct, Justice Sotomayor case. No, I'm sorry. Parmley was Justice Sotomayor. Rogoz was a motorist pulled over. And the officer who believed that this motorist must remember that they're running from the police. That was the disputed fact. But the motorist said they didn't know they were being chased by the police. So they were complying, laying on the ground. And then the cop jumped on the back of this person. Looked at from the disputed facts of that case. It's force that is less than what we're dealing with here today. So there is adequate case law here. And when the defendant says there is not case law that squarely governs, that could only be because perhaps this exact situation hasn't played out. Or one that's so similar that we could look at it and it's the same. To say that there's nothing that squarely governs is to ignore the case law and how we analyze these types of cases. Because the Second Circuit is allowed to look at case law that foreshadows an outcome. Or defines the contours. And basically informs an officer so they know that a certain type of force would be too much or would be unacceptable. This court is allowed to look at other circuits. Which I mentioned in my brief. First Circuit and the Sixth Circuit especially had multiple cases on this type of issue. And the defendant didn't even address the other circuits. They simply addressed the Second Circuit court cases that I mentioned. And said that our case is de minimis compared to those. They also mentioned Jones v. Parmley when they were making that point. Which is a case involving a Native American protest where people were punched, kicked, and pushed. I understand that amongst those plaintiffs someone was choked and something happened to a baby. But some people were just punched or pushed. And I don't recall reading anything in that case about people being unconscious and bleeding and lacerated. Mr. Spencey, unless you have a final point, I think we understand your position. Thank you, Your Honor. And I'm hoping, if you don't mind, you could focus on the jurisdiction question, please. Yeah, so, I mean, obviously, Your Honor, if there are disputed issues of fact that go directly to the essential elements of our qualified immunity claim, then this court doesn't have jurisdiction to decide the issue. But what I would suggest to the court is that by merely saying that there are issues of material disputed fact, it doesn't mean that there aren't. This is one of those rare cases where there is both documentary and film evidence of what happened on the night of this incident. And I would argue to the court that we know this, that there was an altercation. Alcohol was involved. It was in the early morning hours in Burlington. We know that Officer Currow arrived at the scene. We know that Mr. Jock was there, was involved in some kind of dispute with somebody where he was bouncing on the balls of his feet in a way that was wholly consistent with somebody who was either fighting or about to fight. We know that the officer placed his hands on Mr. Jock. There was a brief struggle, and he was thrown to the ground with an armbar takedown. So let me say this, judges. An armbar takedown in terms of the severity of force, as Judge Rice said in the Brayshaw decision, is a minimal use of force. Now, both in Brayshaw and in this case, there were physical injuries that resulted, but in evaluating both the use of force and the concept of qualified immunity, it's important to understand under the circumstances whether the use of force was minimal or whether it was much greater, for example, the use of taser or O.C. spray or the use of a firearm. None of those things were used here. And so I guess what I would argue to your honors is that you do have jurisdiction that this is a case where on the facts that you are – that you know of, at a minimum, there is a right to qualified immunity. And let me just say this again. One of the issues that we grapple with is what is instructive to officers as they go about their duties in the early morning hours where they are alone. There was no one else with him on the night of this incident, and he has to make a split-second decision. Were there any decisions that should have made him aware that if he engaged in a minimal use of force under these circumstances, it would be a violation of constitutional rights? And when I say these circumstances, I am addressing specifically the things that cannot be disputed. And what I would suggest to your honors is that under those circumstances, that there are no decisions that would preclude him from using minimal levels of force and that he is entitled to qualified immunity. All right. Thank you, Mr. Lind. Thank you, Your Honor. All right. Thank you both. We'll take the case under advisement. And that concludes our argument calendar today. Thank you to all our court staff and everyone for keeping things going. And I think we are ready to adjourn.